DETERMINED IN THE

# THIRD DEPARTMENT

AT

# GENERAL TERM,

## May, 1873.

---

## THE PRESIDENT, MANAGERS AND COMPANY OF THE DELAWARE AND HUDSON CANAL COMPANY, RESPONDENTS, v. WATSON E. LAWRENCE, APPELLANT.

*Commerce — Obstructions to navigation — when nuisances — Right of passage subservient to trade and commerce — Right of States over navigable rivers — Direct individual injury necessary to sustain what class of actions.*

Obstructions in navigable rivers made in aid of commerce, which do not *materially* injure free navigation are not *nuisances.*

The court cannot pronounce a simple obstruction in a navigable river to be a nuisance. It is a fact to be found.

Trade and commerce are the chief objects, and the right of passage is subservient to them.

A purpresture is, *per se*, a nuisance. (In this case the structure did not extend below low-water mark.)

* The following opinion of Mr. Justice POTTER, upon which this case was affirmed, in the Court of Appeals, in February, 1874, in which affirmance all the judges concurred, except ALLEN, J., who was absent, no opinion being written in that court, has never been published, and will not appear in the reports of that court. Its importance, in the opinion of the reporter, justifies his departing from the chronological order of reporting heretofore pursued by him, and giving it a place in this series of reports. — [REP.

The States within which are navigable rivers, have a right to exercise jurisdiction over their waters, and may authorize the erection of wharves — not extending beyond low-water mark — not materially obstructing navigation — not to an extent to become a nuisance, except where such action is repugnant to the power " to regulate commerce with foreign nations and among States."

Where there is no direct special individual injury, no action can be maintained by a citizen on the ground that his interests as a member of the State have been interfered with or disturbed.

THIS is an appeal by the defendant from a judgment entered in Ulster county, upon the report of a referee in favor of the plaintiffs.

The question involved in the case is the right of a riparian owner of lands, under a patent from the State, to erect a dock for the purposes of commerce, and the beneficial enjoyment of his own property.

On the 22d day of October, 1868, before the commencement of this action, a patent from the State of New York was executed and delivered to the defendant, granting to him certain lands under the waters of Rondout creek.

This grant is set up in the answer, and is proved on the trial. The defendant was also the owner, by purchase, of a former patent from the State, for another and larger portion of the premises so covered with water, which patent was issued to one Joshua Dubois, May 7th, 1831 — also set up and proved. These two patents covered all the land under water, upon which the defendant claimed the right to build his wharf or dock.

A preliminary injunction was granted by a judge of this court to restrain the building of the wharf. The allegations in the complaint are, that the defendant has commenced driving piles for the wharf, and has driven them so far out in the channel of said creek as seriously to interrupt the navigation thereof, and that the navigation of said creek will be greatly obstructed and impeded. There is no allegation or finding, that the said dock or wharf is or will be a nuisance. The action was referred to a sole referee, whose findings were as follows:

1st. That the plaintiffs are a corporation as alleged in the complaint herein; that they are largely engaged in navigating the Rondout creek in their business as carriers and transporters of coal and other merchandise, which said Rondout creek is a navigable stream, and on which the tide ebbs and flows; that as such carriers

and transporters they employ and navigate a great number of boats upon said creek during the whole of each and every season of navigation.

2d. That the defendant Watson E. Lawrence, who is the owner of lands of great value by reason of the lime and cement upon them, lying and bordering on said stream, is about to engage in the manufacture and shipment to market of cement and lime upon and from said lands.

3d. That the defendant proposes to erect and is now erecting a dock or wharf in front of his said property upon said stream, for the erection of which piles have been driven by him, and which he proposes to use in his business as a manufacturer and shipper of cement and lime.

4th. That said piles as now driven, and said dock or wharf when completed, and as it is to be used for said purposes, are, and will be, an obstruction to the navigation of the said creek.

5th. That the defendant is the owner of deeds or patents from the people of the State of New York, which said deeds or patents have been duly granted to him, and which are correctly set forth in the answer herein. That the deed or patent dated October 22d, 1868, covers and includes the piles now driven, and the whole structure proposed to be erected ; all of which are within the line and exterior boundary on said creek of the land under water thus conveyed.

6th. That by reason of said obstructions the plaintiffs, in their capacity as carriers and transporters, and because of the character and extent of their business in the navigation of said creek, suffer a special and peculiar injury.

And I find and report as conclusions of law : That the plaintiffs are entitled to a perpetual injunction against said defendant, restraining him from the further prosecution of said work of erecting said dock or wharf, and also to an injunction or order directing the removal by the defendant, of the piles and piling already driven and placed by him for that purpose.

Judgment was entered upon this report and an appeal taken to this court. Other undisputed facts will appear in the opinion.

*S. Hand* and *A. Schoonmaker, Jr.,* for the appellant.

*T. R. Westbrook,* for the respondents.

P. POTTER, J.:

The Rondout creek is a navigable stream for vessels of light draft from the channel of the Hudson river, for the distance of about two miles up said creek westerly to a place called Eddyville, to which place the tide ebbs and flows.

The plaintiffs are a corporation, chartered under an act of the legislature of this State, and are the proprietors of a canal extending from Honesdale in the State of Pennsylvania, to Eddyville aforesaid, in the county of Ulster, upon which they transport coal and other freight.

The defendant is riparian owner of land upon the northerly or westerly side of said creek, holding title thereto from patents granted by this State, which patents, as shown by the maps attached as part of the case, convey lands which extend from the land on the shore, at high-water mark, to the channel of said creek.

The proposed structure of dock or wharf by defendant, is within the lines of boundary contained in the said patents from the State to the defendant and his grant.

The defendant is the owner of valuable cement lands and a lime quarry bordering upon this creek, and his purpose of erecting this dock or wharf in front of his said property, and for which he had commenced driving piles, is for the commercial purpose of using it to load and unload boats in his business as a manufacturer and shipper of cement and lime.

The above are now the undisputed facts upon which this case depends. It is true, one of the maps in the case presents the defendant's proposed line of wharf to be outside of his grant, but the finding of the referee, sustained by the evidence, shows it to be within; which finding we must regard as true.

1st. The plaintiff bases its claim for relief, first, upon the fourth finding of fact by the referee: "That said piles as now driven, and said dock or wharf when completed, and as it is to be used for said purposes are, and will be, an obstruction to the navigation of said creek;" and also upon the sixth finding, "that by reason of said obstruction, the plaintiff, as carriers and transporters, and because of the character and extent of their business in the navigation of said creek, suffer a special and peculiar injury." The theory upon which the plaintiff's case stands is, that this fourth finding is a

*material* finding of fact, and not at all a question of law, nor a mixed question of fact and law; and that the sixth finding that the manner and extent of the plaintiff's business in navigating said creek, presents a case which authorizes him as an individual to bring this action. The decision of this case must depend upon the soundness of these positions.

The defendant's exceptions to the finding of fact and law, and the undisputed facts in the case, are sufficient to present the whole case for our consideration.

Assuming the findings to be sustained by evidence, the case is not then free from complication and difficulty; and if the facts as found were all the facts in the case, and were all sustained by evidence, I am inclined to think they do not sustain a judgment of perpetual injunction. They come short of finding enough to sustain it. This is the first point I propose to discuss.

But the proper decision of the case also involves the necessity of examining the undisputed testimony to see if those findings are even legitimate deductions therefrom. Important evidence which is controlling of issues in the case, and necessary to be considered, is not passed upon by the issues found, and though we cannot, as the case is made, treat this as error, we may examine such evidence with reference to the issues that are found (except such as is in conflict), and give to all legitimate force.

These undisputed facts, not found but appearing from maps in the case, are, that the whole width of the Rondout creek, at the narrowest point, at the lower end of the defendant's proposed dock or wharf, from shore to shore, is 690 feet, and at the upper end it is 900 feet wide.

The *actual channel*, as it is called by navigators, at the narrowest point opposite this wharf, is about 150 feet.

That the proposed dock, if allowable, was of a suitable size for practical business purposes, and could not be made any smaller for such purposes, and for practical use as a dock. The obstruction — the only obstruction—to the navigation of said creek to the plaintiff's injury, as proved, and upon which the referee based his finding, is, to the movement of a cluster or a flotilla of boats moved or propelled upon said creek by what is called tugs or small steamers, towing canal boats and other small boats, so arranged as to move

three, four or five boats abreast in tiers; the number always depending upon the demand of patronage and state of the water, thus towing from three and four to twenty boats by one tug, sometimes occupying nearly the whole width of the stream.

These facts, it seems, it is necessary for a full understanding of the case, should be stated; for this, it appears, is the first case to be found in this country where the question of the obstruction of a navigable stream by the erection of a *wharf* for the purposes of commerce, has been in the courts.

Cases for obstruction to navigation by the erection of bridges, dams and floats, are found in the books, but bridges and dams are not in general supposed to be erected in aid of commerce by water. A clear distinction is thus perceptible between obstructions by bridges or dams, and obstructions by docks or wharfs. I take it that where there is no dispute about title, and an obstruction is claimed to exist, and the erection is intended to be in *aid* of commerce, then the question which determines its legality is, whether the benefit arising from such aid is not greater than the injury resulting therefrom to navigation.* This raises a question of fact to be tried by a jury. Such is the law of this country as I understand it. Obstructions made in aid of commerce, which do not *materially* injure free navigation, are not *nuisances.*

A structure which promotes the convenience of the public cannot be a nuisance to it.†

In this case there is no finding of a *material* obstruction.

It is not, therefore, every encroachment upon the navigable waters of a stream, that is, *per se*, illegal, or a nuisance. The exception is in cases of purpresture.

It is possible that the public benefit to commerce arising from the erection of a wharf, will more than countervail for the public injury to navigation resulting from a narrowing of the stream. *Commerce* is the superior, and comprehends or includes navigation, which is subordinate to commerce. Navigation does not control commerce. ‡   " Commerce includes navigation." §

The report of the referee in this case, is based upon the idea, as

* Wheeling Bridge Case, 13 How. (U. S.) R., 592, 605.
† Per TANEY, Ch. J., 13 How., p. 591.
‡ Gibbons v. Ogden, 9 Wheat., 190.    § Gilman v. Philadelphia, 3 Wall., 724.

appears from his opinion, that the whole width or waters of the creek, in respect to the right to use them for *navigation*, belongs to the people of the United States for the purposes of navigation; that neither docks nor wharves can be constructed upon the margins by an individual riparian owner, even for the purposes of commerce, which in any way restricts or narrows the stream or interferes with free navigation. This, upon the broad ground claimed, I regard as serious error. It must be a *material* obstruction; it must be a *nuisance* to justify an injunction.*

Commerce, as we have already said, is not subordinate to navigation, but includes it, and what is for the benefit of commerce, is not made to yield to and give place to what is claimed for free navigation. They are not convertible terms. At all events, the rights of commerce when they conflict with the rights of free navigation, have at least an equality of right to protection. Navigation, it is true, is one form of commerce, but it is not the whole of it; and is not to be protected at the expense of all others. Navigation would be but a helpless auxiliary to commerce, and an empty name without the aid of docks and wharves, where ships and other vessels can load and unload their cargoes. Where would vessels receive and unload their cargoes without wharves?

According to the doctrines claimed by the plaintiff and substantially sustained by the referee, each individual possesses the absolute right to enjoy "free navigation" upon all navigable waters: That is to say, to sail over every part of a river or creek not previously occupied, up to the shore or utmost verge of the stream; and that any encroachment upon the stream is such an obstruction as amounts to a nuisance, and can be enjoined, because it obstructs "free navigation." This is not true as an absolute rule. This assumption is practically an impossible proposition. This question requires to be examined as well upon reason as upon elementary and judicial authority. If this is the law, then every structure or wharf in navigable water is an obstruction and a nuisance. Immemorial custom, the law of necessity, the demands of commerce, and all reason forbid that this should be the law. It is not true as to ports and harbors; it is not true as to large navigable rivers.

Wharves exist on all navigable waters known in the commercial

* Hazard v. Hudson River Bridge Co., 27 How. Pr., 300.

world, as will be seen hereafter. If not true as to large rivers, by what rule or standard is the stream to be measured which does exclude wharves for the benefit of commerce? There is no such rule to be found applicable to American waters, in rivers, or navigable streams, large or small.

This was not even the rule by the old English common law, which went much further in this respect than our American law, as to navigable waters. Lord HALE, in his De Portibus Maris, "Pais Secunda," chapter 7, page 85, says: "It is not every building below the high-water mark, nor every building below the low-water mark, that is *ipso facto* in law a nuisance. For that would destroy all the quays that are in all the ports of England. For they are all built below the high-water mark; for otherwise, vessels could not come at them to unload," etc.

There is no more material aid to commerce, or even to navigation, than docks and wharves and piers. Indeed, they are so indispensable to commerce by water, and to navigation, that, practically, neither could be conducted without them. They are a necessary part of their appendages; they exist everywhere, in rivers, in ports, in harbors, wherever vessels are laden or unladen.

. They are a part of the known fixtures and facilities, known to the common law, in aid of commerce and of navigation. We may take judicial notice of their existence in all the navigable waters of this and of other States. If the displacement of water at low-water mark upon the margin of navigable rivers and other waters, is an obstruction to free navigation that amounts to a nuisance to be abated or enjoined, then every dock or wharf or pier upon the Hudson and East and Harlem rivers, and in the bay or port of New York, Brooklyn, Albany, Troy and Hudson, are also obstructions, and could have been abated as public nuisances equally with this. They all encroach upon navigable waters.

The doctrine of "free navigation," claimed by the plaintiff, goes to the extent that every encroachment that interferes with any portion of a navigable stream, is an obstruction and a nuisance that can be abated, in that the right of navigation exists upon and over every part of the stream between the banks, by the public law of the right of navigation. Nothing short of this rule can sustain the judgment.

There is no case to be found in the books of American law, where this doctrine to that extent is laid down as law, in the sense claimed. This doctrine carried out would exclude all. the commerce by water of the cities and towns on the Hudson river, because they would have no right to displace one foot of the water for the erection of commercial wharves; it would obstruct free' navigation, which, according to this claim, demands the whole width of the stream from shore to shore.

It may well be conceded in general terms that every obstruction to navigable waters that amounts to a *nuisance*, which means a *material* obstruction, may be abated. But it is not every obstruction that amounts to a nuisance, and even the English doctrine does not go beyond this. This is the distinction that is controlling of this case. If the proposed wharf would have been such a construction that its encroachment amounted to a nuisance, then it could be abated. Then it was proper to have granted the injunction; then the judgment is right. If it is not such an obstruction as to create a nuisance, then the judgment is erroneous. This is the material point in the case.

1. The obstruction is not *found* to be a nuisance by the referee.

2. A mere *obstruction* to navigation is not *per se* a public nuisance.

3. The court cannot pronounce a simple obstruction to be a nuisance. It is a fact to be found.

4. The finding of an obstruction merely, does not authorize a judgment of perpetual injunction.

It may well be conceded, for such is the law, that even the erection of a wharf may so far encroach upon the navigable channel of a stream, as to become a material obstruction, and, therefore, a nuisance, and may in such case be abated; but the finding of an obstruction only, without finding it to be a *material* obstruction, or what is equivalent, without finding it to be a nuisance, does not authorize a judgment to abate it, or an injunction to restrain its erection, as the authorities abundantly show. Obstructions of various kinds are authorized by the law of commerce, and commerce, at least, has an equality of right with the right of navigation. No obstruction erected for the benefit of commerce, can be a nuisance though it be an obstruction, unless it be also found

*materially* to impair the right of navigation. It is not enough that it impairs navigation. Going to the radical English authority, the case of *The King* v. *Russell*,* furnishes examples. HOLROYD, J., says: " There is a public right of navigation ; there are also public or private rights of fishing ; public or private rights on the shore. For traffic there are rights, not only of navigation *sc. eundo et redeundo*, but *morando*, for loading and unloading, or for a wind, etc " The enjoyment of *each of those rights* by some, is frequently and *necessarily* an obstruction to the free and complete enjoyment, either of the same right or of some other of the above rights in others, for example : Ships at anchor in the channel of the river, are an obstruction to ships sailing, etc. Boats and wherries plying, keels lying in the river, are also an obstruction. *But such obstruction is not necessarily, or as matter of law, a nuisance, public o~ private.* Each of the rights above mentioned must at times yield and become subordinate, as may be necessary or reasonable ; at least in part to some of the others. * * * Ships, in order to load, must lie, if not at the staiths in the channel of the river, with their loading keels, so, in other trades, the ships lie at the wharves or elsewhere in the river or port, to load or unload, and their obstruction to others is or is not, as well as the erection of the wharf itself, a nuisance to the navigation."

I have made this extended extract from an English authority, to show that even in England there is no such thing as absolute " free navigation," in the full sense claimed by the learned referee in this case ; and as is claimed by counsel on the argument before us. What is claimed in this case as the right of " free navigation," is an absolute monopoly to *navigation* over every other interest of commerce, and to the exclusion of all rights of the riparian owners of land, and of all other persons residing upon the margin or borders of navigable streams. The claim is, that navigators, starting at the terminus of a navigable stream, possess the exclusive right not only of navigation but of commerce, to the whole width of the stream, and it excludes the exercise of the same rights to the dwellers upon the border of the stream. The latter, though desiring to enter into commercial dealings and to enjoy the common rights of navigation to that end, are excluded from the enjoyment

---

* 6 Barn. & Cres., 585, 586.

by this law of " free navigation," so called, except at the expense or burden of carting their products to the terminus of the stream. Under this claim every dock, every wharf, every erection for the loading or unloading of vessels, if they encroach upon one foot of water upon the margin of the stream, even at high-water mark, are obstructions to free navigation, and can be abated. Free navigation, I take it, is an abuse of terms, if all who desire its use in commerce, are not allowed equal rights in navigation. It is not free navigation that excludes every facility to transport one article of commerce, that another may enjoy the whole surface of the water for another article. Neither in law is one commodity of commerce subservient to the other. I am glad that I can find no American adjudication to sustain this unreasonable position, and even the more sensible English authority is against it to this extent. In *King* v. *Russell*,* BAYLEY, J., who tried the case, and who charged the jury, said : " But my opinion is that the use of a public water is *not* for *passage only*, but for many other purposes, and that many of those purposes are entitled to supersede the right of passage, and to narrow the rights of passage to those parts which may not be requisite for greater and more beneficial purposes." Where there is a space of water of very considerable extent, some part may be most usefully applied to the purposes of commerce, and that which is so applied may be over and above that which is sufficient for navigation ; and .where a great public benefit results from the abridgement of the exercise of the rights of *passage*, the great public benefit makes that abridgement no nuisance, but a useful, beneficial and proper purpose. This charge was held to be sound. The same judge, afterward, in considering the case in bank, added: " The right of the public upon the waters of a port or navigable river, is not confined to the purposes of *passage ;* trade and commerce are the chief objects, and the right of *passage is chiefly subservient* to those ends." The question whether an obstruction is a nuisance is answered by another, which is simply this : Is the obstruction injurious to the rights and interests of the public, or if individuals, beyond the benefits that its erection confers on both ? † Nor can I hold the argument sound, that the wharf in

* 6 Barn. & Cres., 585–586.   † Wheeling Bridge Case, 13 How. (U. S.) R., 605.

question was to be erected for a private purpose, which would interfere with the *public* right of navigation.

The individual owner of a wharf, erected to aid commerce, is no more engaged in *private* interests than the owner of the vessel which transports *private* property. The public are equally interested in the commerce to be conducted by the one as by the other.

It is equally beneficial to the public, perhaps, that the commodities of cement and lime should be brought to market as it is for coals. They both equally belong to commerce; it is as useful to the public that a dock should be erected from which to load vessels with cement, as it is that a dock should be erected to unload coal. Docks and vessels are alike required by commerce for each commodity.

Each is equally in aid of commerce; neither is the superior of it.

Is the transporter of coals or the commerce of coals less private, less selfish, than is the transporter of cement? Are not the facilities of docks and wharves for loading and unloading of vessels for the public benefit? Do not all impediments thrown in the way of the commerce in cement increase its price? Who but the public are benefitted in the reduction of the price of cement? Does not the facility of loading it into boats or vessels cheapen that commodity? In the case of *Pennsylvania* v. *Wheeling Bridge Company*,* Justice DANIEL said: "Common sense and consistency assure us, that to pronounce that to be wrong and an injury which is in reality *beneficial*, involves a plain absurdity." The right of free navigation and the employment of the facilities of navigation, are as free to the manufacturer of cement as to the miner of coals. Neither commodity is the superior of the other. Neither can exclude the other from an equal participation in the navigation of the same stream; nor from exercising the same rights. If the stream is too small for the fullest exercise of this right by both, this is the defect of physical nature; it is no cause why one should exclude the other. Equality, then, is equity and justice. Each must then submit to exercise the right upon terms of equality in the limited degree afforded by the capacity of the

* 13 How., 605.

stream; and each has an equal right to exercise the reasonable necessary facilities to that end, which does not *materially* interfere with the other so as to create a nuisance.    The exercise of a monopoly may itself become a nuisance.

It may be stated, however, that the case of *Rex* v. *Russell*, from which we have quoted, is not without some conflict of opinion in the English courts, in criminal cases.    It has been questioned in later criminal cases, but not overruled, nor is it affected, as I think, so far as it applies to the question in the case at the bar.    Two cases are referred to as holding a different doctrine, viz., *Rex* v. *Ward** and *Rex* v. *Tindall*;† but they can be easily distinguished, without being in conflict in a case of mere nuisance.

The case of *Rex* v. *Ward* (pp. 386–387), though it questions *King* v. *Russell*, I think decidedly sustains the position we have assumed above, that the finding of an obstruction *only* is not a sufficient ground for abating it, and is not a nuisance.    Lord DENMAN, Ch. J., who tried the action, says : " In summing up the evidence, after a long trial, I asked the jury to state their opinion whether the causeway the [obstruction complained of], in its altered state, was a *nuisance* to the navigation of the river, and whether the public benefit was greater than the inconvenience.    The jury, after deliberation, stated *that an impediment had been created ;* but I declined to receive that expression *as not necessarily equivalent to the word nuisance*, which might be too trifling in degree to be properly so called.    They said at length that they considered it to be a *nuisance*, but they added that the inconvenience was counter-balanced by the public benefit arising from the alteration made by the defendant."    This, it must be remembered, was the trial of an indictment for a *nuisance*, which, in contemplation of law, is criminal.    In such case, therefore, the finding of the jury, in addition to a verdict of *guilty of a nuisance*, could have no effect ; it is like a recommendation to mercy from the jury ; which is no part of the legal verdict, and the Lord Chief Justice properly said, " it is against first principles to say there can be a compensation by way of set-off for *a crime*," and of course a new trial was refused.    There is nothing, it is seen, in what was then decided in conflict with *King* v. *Russell*.

The case of *King* v. *Tindall* was also an indictment for a nui-

* 4 Ad. and Ellis, 384.                † 6 Id., 143.

sance, by erecting and continuing piles in a harbor, and thereby obstructing it and rendering it insecure. The case was tried before Lord DENMAN, Ch. J., in 1837. The verdict of the jury was special, "that by the defendant's works, the harbor, in some extreme cases, was rendered less secure." This verdict was in effect that the defendant's works were in a degree injurious to navigation, rendering it, in extreme cases, less secure; but the question was, whether such a finding was equivalent to finding it a *nuisance*, Lord DENMAN held it was *not;* and he directed a verdict of not guilty. Like the case at bar, the obstruction was some injury to navigation, but it is not every impediment to navigation that is a nuisance.

In the last cited case, all the former adjudications in the English courts, including *King* v. *Russell*, as well as English elementary law, were referred to as authority. But it must be observed that the law of waters, of navigation and of commerce in England, is not regulated there entirely by the common law. There is not an entire uniformity of law in that country in its application to all their navigable waters. Various statutes have been passed there regulating navigation and commerce upon different rivers and navigable waters, which are not alike applicable to each and to all; and what appears to be conflict of authority there, is attributable in degree to this want of one single system governed by uniform law. Nor are we in this country entirely governed in this respect by what is called the common law of England. Their common law is the outgrowth of peculiar circumstances, of necessities which relate to their condition, and which is not applicable here. We brought with us only so much of that common law as is applicable to our own situation and condition here, and their common law has hitherto been received by us with such modifications as will adapt it to the peculiar character of our streams, and to the commerce to which they may be used.

We will proceed, then, to examine some of the American authority, to see how far it agrees with the positions expressed above, as it regards the true question to be decided here upon this point. The leading case relied upon by the plaintiff, is *The State of Pennsylvania* v. *The Wheeling Bridge Company*.* That case, like

* 13 How. (U. S.) R., 518-519; id., 647, etc.

the present, was a civil action, *not* for the recovery of damages, but to restrain the erection of a bridge, on the ground that it was or would be an obstruction of navigation for the purposes of commerce.

The difference in the cases is that, in that, the bridge was claimed to be a certain and an absolute obstruction, which impaired the rights of free navigation and commerce. The case at bar is for a partial, occasional and incidental obstruction, by a structure intended to facilitate commerce. In the *Wheeling Bridge* case, I find the following remarks from Justice McLEAN: " The multiplication of commercial *facilities*, will, in the same proportion, increase the articles of trade." * * " If the obstruction be *slight*, as a draw in a bridge, which would be safe and convenient for the passage of vessels, *it would not be regarded as a nuisance,* where proper attention is given to raise the draw on the approach of vessels."

Ch. J. TANEY, in the same case, said : " I am by no means prepared to say that this bridge would be a public *nuisance*, even at common₀ law." * * "*A structure which promotes the convenience of the public, cannot be a nuisance to it.*"

This argument proceeds upon the ground that even a bridge may promote commerce, though in degree it obstructs navigation.

The implication from this is, that commerce is the superior of navigation, and Justice DANIEL, in the same case, referring to various adjudications of the court upon the subject of bridges being obstructions to commerce, says: " It follows, then, from these adjudications, not less than from the principles of common sense, that the conclusion, *nuisance* or *no nuisance,* is dependent solely upon the character of the act complained of as being noxious or beneficial to the public." And he adds that, when the charge is denied, it must be determined from circumstances, and is a question of fact for a jury. This remark proceeds upon the adjudged view also, that all obstructions to navigations are not nuisances. Justice STORY says :* " But the question of nuisance or not, must, in cases of doubt, be tried by a jury, and the injunction will be granted or not as that fact is decided." This is an authority to the point, that *nuisance* is a question of fact, and the fact of nuisance must be *found* to justify an abatement.

* Eq. Jur., vol. 2, § 923.

If every obstruction was a nuisance, there would be no fact necessary to be found; an obstruction would then *per se,* as a matter of law, be a nuisance.

The courts of our own State have also adopted the doctrine, that something beyond simple *obstruction* in navigation is necessary to make the act unlawful; in other words, it must be a *nuisance* to produce that effect. This was held in the *People* v. *Sar. and Rens. Railroad Co.*\* The language is so qualified by SAVAGE, Ch. J., who says : " The place, therefore, where the bridge is built, is one which coasting vessels have a right to pass, and where any obstruction *entirely preventing* or *essentially impeding* the navigation, would be unlawful." In the case of *Dutton* v. *Strong,*† Justice CLIFFORD says : " Bridge piers and landing places, as well as wharves and permanent piers, are frequently constructed by the riparian proprietor on the shores of navigable rivers, bays and arms of the sea, as well as on the lakes, and where they conform to the regulation of the State, and do not extend below low-water mark, it has never been held that they were a nuisance, unless it appeared that they were an obstruction, to the paramount right of navigation. Whether a *nuisance* or not, is a question of fact, and where they are confined to the shore, *and no positive law or regulation was violated in their erection,* the presumption is that they are *not* an obstruction, and he who alleges the contrary must prove it. Wharves, quays, piers and landing places, for the loading and unloading of vessels, were constructed in the navigable waters of the Atlantic States by riparian proprietors, at a very early period in colonial times, and, in point of fact, the right to build such erections, subject to the limitations before mentioned, has been claimed and exercised by the owner of the adjacent land, from the first settlement of the country to the present time." ‡

We have already distinguished between the obstruction by a wharf, built in aid of commerce, and an obstruction that was not; and have asserted that navigation was the subordinate of commerce, and not its superior. If such a distinction exists in law, it is in favor of this case. In *Gibbons* v. *Ogden,* § Ch. J. MARSHALL says :

---

\* 15 Wend., 132.                           † 1 Black, U. S. R., 31.
‡ See, also, Angell on Tide Waters, p. 126, to the same effect.
§ 9 Wheat., 190.

"All America understands, and has uniformly understood, the word '*commerce*' to comprehend navigation. It was so understood when the Constitution was framed." In another part of the same opinion he specifies what other subjects beside navigation are included in the comprehensive term "commerce." In the same case, Judge JOHNSON says: "Commerce, in its simplest signification, means an exchange of goods. But in the advancement of society, labor, *transportation*, intelligence, care, and various mediums of exchange, become commodities, and enter into commerce; the subject, the vehicle, the agent, and their various operations, become the objects of commercial regulation."

I have dwelt thus at length upon this point to demonstrate that a commercial wharf, which does not so obstruct navigation as thereby to become a public nuisance, is the equal, indeed the superior, of navigation, which is only another of the aids of commerce; and also to prove that no finding of the fact of an obstruction, which fails to determine that such an obstruction is a *material* one or a nuisance, can sustain the judgment in this case. I have not, however, attempted to prove that a wharf may not be so constructed as to become illegal. I concede it may be so constructed as to become a nuisance, but it must be so found by the jury or referee. So too, doubtless, *navigation* may be so conducted — it may be so monopolizing and exclusive — as not only to become itself a nuisance to other aids to commerce, but even to become the destruction of other commercial aids, and of a commercial wharf legally constructed. A single individual or body of individuals, corporate or otherwise, may so exclusively possess and obstruct a narrow stream by a flotilla of boats, as to create a nuisance by a monopoly, or by excluding all other commerce; but this, of course, only in case of an *unreasonable* obstruction. In the case of *Mississippi and M. R. R. Co.* v. *Ward,* * Justice CATRON lays down the rule as to obstructions as follows: "That if the abridgement of the right of passage, occasioned by the erection, was for a public purpose and produced a public benefit, and if the erection was in a reasonable situation, and a reasonable space was left for the passage of vessels, then it is not an unreasonable obstruction."

The case of *Grant* v. *Davenport*, † is to the same effect, but goes

* 2 Black R., 494–495.  † 18 Iowa R.

still further, in holding that the wharf does not interfere with the free navigation of a river; on the contrary, it assists rather than obstructs, though that case was based on the right of the riparian owner to build wharves.

I find an abstract note of a case in 12 American Law Register, 195, where a purchaser of lands, under the laws of the United States, bordering on a navigable stream, stopped at the edge of the stream and did not extend to the center. Yet it was held that he had the same right to construct suitable landings and wharves as riparian proprietors on navigable rivers affected by the tide. *

There is, as we have said, no finding of law or fact in the case at bar to meet this requirement. I have thus far discussed this case upon the point that the finding of fact by the referee, that the wharf was an obstruction, is not sufficient in law to sustain his conclusion of law, nor to sustain the judgment.

I now propose to examine the acknowledged positions of the defendant as a riparian owner, claiming title to the land to low-water mark, upon which he proposed to erect his wharf, and that his proposed wharf was for purposes of extensive commercial operations. These are two circumstances that distinguish this case from a class of cases in our own courts, which are claimed to be in conflict with the views we have above expressed.

This distinction it may be necessary to show. It may be conceded that an individual, for his own private purposes, without title to the soil, would be guilty of an obstruction which would be a public nuisance, who should erect a wharf or make any other encroachment upon a navigable stream, port or harbor. It is a class of cases of this kind that are set up as being in conflict with the views expressed in this opinion, but which clearly are not so. Among these is the case of *Hart* v. *Mayor, etc., of Albany.*†

That was a case of clear, *unauthorized* and *illegal* encroachment for private purposes.

It is what, in law, is properly called a purpresture, which is a " clandestine encroachment and appropriation of the land of another,

---

* Reported in Wisconsin Imp. Co. v. Lyons, 30 or 31 Wis. R.

† 9 Wend., 571; see opinion of SUTHERLAND, at pages 584 and 589; of Senator ALLEN, page 591, and of Senator EDMONDS, at pages 598, 599 to 601.

or upon land or waters that should be common, or public." *
A party who is only entitled to free passage upon a public high-
way, upon land or water, has no right to occupy it by any perma-
nent obstruction; and any such obstruction can be abated by indict-
ment, or by an individual who is injured or aggrieved by it; and
such obstructions may be declared to be nuisances, whether they
are shown to produce injury or not. Even benefits or advantages
to the public cannot be shown in defense. A purpresture is *per se*
a *nuisance.* Offers made to prove a purpresture a public benefit
are and should be excluded. The case of *The People* v. *Vander-
bilt* † is another clear case of purpresture. Though it was claimed
that the construction of the crib or pier in the harbor of New York,
was under the claim of city and legislative authority, it was held
that neither the legislature, or the city, had any authority to make
such erection beyond the pier lines of the city.

It was an encroachment upon lands the city did not own, had no
power to convey, and to which the legislature could confer no title.
There is no conflict of that case or that class of cases with the views
expressed as the law in the case at bar. The same doctrine of ille-
gal encroachment was held as an unauthorized obstruction of
streets, in *Davis* v. *The Mayor of N. Y.* ‡ The case of *The Peo-
ple* v. *Vanderbilt* was again in the Court of Appeals under like cir-
cumstances, and the same doctrine repeated, that a purpresture is a
nuisance in a bay or navigable river. There is no conflict between
these cases and the views above expressed with regard to the case
at bar. There is no likeness between them. The only similarity
between these cases of purpresture and the case at bar, is the fact
that the structures in both are made in navigable waters. The
class are purpresture, which are obstructions to navigation — clan-
destine encroachments, not within but beyond low-water mark,
they are not only without title to the soil, but are without author-
ity, right or title in those who construct them. The case at bar is
a structure upon the defendant's own soil, is in aid of public com-
merce, is within the defendant's lines, and within low-water mark
of the stream. A *purpresture* is not a term that applies to a wharf
built upon the shore of a navigable stream by the proprietor of the
soil, but only so when carried so far into the channel, or so far

* Co. Litt., 277, 6.    † 26 N. Y., 287.    ‡ 14 N. Y., 506.

beyond his title, as to become a nuisance. This doctrine is as well settled law as that a purpresture is *per se* a nuisance. In *Dutton* v. *Strong*,* Judge CLIFFORD says, in expressing the opinion of the court, as follows: "Whenever the water of the shore, so to speak, is too shoal to be navigable, there is the same necessity for such erections as in the bays and arms of the sea; and where that necessity exists, it is difficult to see any reason for denying to the adjacent owner the right to supply it; but the right must be understood as terminating at the point of navigability, where the necessity for such erections ordinarily ceases."

This was said in a case where the wharf was erected for private purposes, and the proprietor sued a navigator for injury done to his wharf or pier by the mooring of a vessel to it in a storm.

The judge who tried the case charged the jury that, though the pier was private property, it was still for the accommodation of commerce. The court in bank held this charge sound. They said "piers or landing places and even wharves may be private, or they may be in their nature public, although the property may be in an individual owner." * * "Undoubtedly a riparian proprietor may construct one of these improvements for his own exclusive use and benefit, if confined within the shore of the sea or unnavigable waters," etc., and then again (say the courts), " the obstruction to navigation must be plainly a *nuisance* before it can be removed by *decree*." But the obstruction, as claimed in the case at bar and as found by the referee, was for a public purpose—for the purpose of commerce. In such case the acknowledged law of this country is the same as is laid down in the English case of *King* v. *Russell*.†

That case was adopted as law in *Mississippi and M. R. R. Co.* v. *Ward*, ‡ which also adopted the case of *The People* v. *Saratoga and Rens. R. R. Co.* § The plaintiff's claim, and the referee's report in the case at bar, are based upon what is claimed to be the law of the United States: "that the whole surface waters of this creek, in respect to the right to use it, belongs to commerce and navigation, or rather, that it belongs to the people of the United States *for the purpose of navigation;* and that no individual can restrict or diminish such privileges." The first branch of this sentence would

* 1 Black, 32, 33.   † *Supra.*
‡ 2 Black United States Reports, 494, 495.   § 15 Wend., 114.

not be controverted — it belongs to commerce. It can as appropriately be used for the purpose of " commerce," with wharves erected upon its shores as without; perhaps, in a greater degree; but the latter or qualifying sentence of this proposition limits it to *navigation*, which, as has been said, is but the handmaid of commerce, and is its subordinate.

This presents really the whole question in controversy in law. This last proposition I cannot concede to be the law. The claim, in short, as it is insisted upon, is summed up in the words, " an unqualified right to free navigation in every part and portion of the stream." We have no such law of " free navigation." The contrary has been expressly adjudged. The same thing was claimed in the case of *Mississippi and M. R. R. Co.* v. *Ward,* * to which Justice CATRON replied: " It is insisted with great earnestness that the public is entitled to the free navigation of the *whole* river from bank to bank." * * " According to this assumption, no lawful bridge could be built across the Mississippi anywhere; nor could the great facilities to commerce accomplished by railroads, be made available where great rivers had to be crossed." He repudiates the doctrine by dismissing the bill.

2. " Navigation within any State, is the subject of State legislation." † If the legislative power of the *Union* can reach them it " would be for national purposes." ‡ *Navigation* is, therefore, within State jurisdiction; is in degree subject to State legislation; and can legally be partially hindered by State inspection laws, by quarantine laws, pilot laws, health laws, police laws, and other laws regulating the internal commerce of a State; and bridges, ferries, turnpike and railroads, are included in the demands of commerce, and to which navigation is, in degree, subject. Free navigation in the sense demanded, is not tolerated by the laws of this country, certainly not by the law of this State. " By a free navigation " (says Chief Justice SAVAGE), " must not be understood a navigation free from such partial obstacles and impediments as the best interests of society may render necessary;" § and it may be added that free navigation in this State does not exclude the construction of wharves for commercial objects limited by the rules

---

* 2 Black, 496.   † Gibbons v. Ogden, 9 Wheat., 203.   ‡ Id.
§ People v. Sar. & Rens. R. R. Co., 15 Wend., 114.

we have laid down above, viz : "if constructed within the limits of low-water mark upon the proprietor's soil, and not so *materially* obstructing navigation as to become a nuisance." The best interests of commerce demand them. Water commerce cannot be carried on without them.

It js pressed with great earnestness, because the right of navigation is a *natural* one, that it may be enjoyed as a right existing under the superior authority of the government of the United States, that it is specially subject to its fostering care and protection as against all other rights. It is true that navigable streams are natural means of commercial intercourse, but natural reason and common experience teach us that commerce cannot rely upon nature alone to this end. How is commerce to be practically conducted upon natural streams without the appliances of art and science and civilization ? How progressed without the construction of ships, and steamboats, and sloops, and canvas, and wharves, and piers, and docks ?

It is made a question whether the patents from the State of New York, to the defendant and his grantor, conveyed any title to the lands between high and low-water mark upon the margin of this creek. It is not necessary in this case to inquire as to the title *beyond* the line of low-water mark, and the discussion of that point would be *obiter*.

First, I regard it as clear from elementary authority, as well as upon adjudged cases, that all sovereignties, within which are navigable rivers, have a right to exercise jurisdiction over their waters.* It is not questioned that, before the federal Constitution, each State as sovereign could govern within its own limits all matters in and relating to navigable waters, quarantine and health stations, ports of entry, docks, wharves, navigation and internal commerce, including regulations for ferries, bridges and roads. Since the formation of the Constitution, it has been held that navigable rivers, for some purposes, and the soil under them, belong to the States in which they are situated.† The English authorities upon this point, says

* Vattell, B. 1, ch. 237; Justin. Inst., B. 2, tit. sec. 1, 294; United States v. Bevans, 3 Wheat., 363, 339; Pollard, Lessee, v. Hogan, 3 How., 212.

† Pollard, Lessee, v. Hogan, *supra ;* Martin v. Waddell's Lessee, 16 Peters, 367, 410.

Chief Justice TANEY, cannot be reconciled; they are greatly conflicting, but their authority does not affect this question. When the Revolution took place, the people of each State became themselves sovereign, and in that character held the absolute right to all their navigable waters, and the soils under them, for their own common use, subject only to the rights since surrendered to the general government. * It is not pretended that this power has been delegated to the general government, or is conveyed under the power to regulate commerce and navigation. "It remains, then, in the State legislatures, or it exists nowhere." † "A State may, for the safety or convenience of trade, make regulations of commerce for its own ports and harbors; and such regulations are valid until they come in conflict with a law of congress." ‡ "This power has been continually exercised by the States, and has been continually recognized by congress, and constantly affirmed and supported by this court whenever the subject came before it." *But congress has passed no act to control State authority over navigable rivers or creeks within the boundaries of a State.* And, therefore, the right to build wharves upon such streams within State limits, not extending beyond low-water mark, not materially to obstruct navigation, not to an extent to become a nuisance, is clearly authorized, unless found to be directly repugnant to the power "to regulate commerce with foreign nations and among States." § Per CATRON, J.: "That as congress has taken no action on the subject, the States, from a controlling necessity, have been allowed to make such regulations for providing suitable facilities from ship to shore;" ‖ that it would be impracticable, if not impossible, for congress to pass acts adapted to all the minute circumstances of large and small streams upon harbors and rivers of inland waters, and they have not done so. It is not necessary to decide what congress might do, if it chose to call all its powers into exercise. But this power of congress still remains dormant, as was said by Chief Justice MARSHALL, in *Wilson* v. *Black Bird Creek Marsh Co.*¶ That was a case where the legislature of the State of Delaware

* Id., 367, 410.

† Per SAVAGE, Ch. J., in People v. Sar. & Rens. R. R. Co., 15 Wend., 132.

‡ Per TANEY, J., in License Cases, 5 How., 579, 581.

§ See License Cases, 5 How. (U. S.) R., 606.　　‖ Id.　　¶ 2 Peters, 252.

authorized the construction of a dam across a navigable creek, in which the tide ebbs and flows to a much greater distance than in the Rondout, and it was conceded that this dam was an abridgment of the navigation of this creek.   The chief justice said, " But this abridgment, unless it comes in conflict with the Constitution or a law of the United States, is an affair between the government of Delaware and its citizens," etc.   It was urged in that case that the act of damming up this creek was in conflict with the *power* of congress to regulate commerce, etc., but the chief justice replies to this argument by saying, " if congress had passed any act which bore upon the case, any act in execution of the power to regulate commerce," the object of which was to control State legislation over those small navigable creeks into which the tide flows, we should not feel much difficulty in saying that a State law coming in conflict with such an act, would be void.   But congress has passed no such act, and he adds, " The repugnancy of the law of Delaware to the Constitution, is placed entirely on the ground of its repugnancy to the power to regulate commerce with foreign nations and among the several States; a power that has not been so exercised as to affect the question."   That was a much stronger case for an injunction than the case at bar.   That was a total obstruction by a dam.   This the slight partial one by a wharf.   That case has never been overruled, but subsequently sustained ; it is a direct case in point.   I need not refer to cases of obstructions by bridges and other encroachments.   It is conceded that there is great conflict in the cases as well as complication in obstructions upon *certain* navigable waters, because in relation to some of them congress *has* directly acted ; not so as to the navigable streams of this State. Upon this ground, also, I think the legal conclusion of the learned referee was in error.

The question upon this point is not what is the *potential* jurisdiction of congress over the subject of controversy ; not how far congress *may* interfere with the question at issue between the parties, but how far has it exercised the power.   All this, also, has been well adjudicated, even in the case of obstructions by bridges, in the case of *Pennsylvania* v. *The Wheeling Bridge Co.*\* This *Wheeling Bridge case*, it is curious to observe, is relied upon by

\* 13 How. (U. S.) R.

both parties, as authority.  On the part of the defendant, because the reasoning is in favor of State jurisdiction over the commerce of navigable streams within her jurisdiction, provided they do not amount to *material* obstructions to navigation.  On the part of the plaintiff, because that particular bridge was a *material* obstruction to the navigation of the river to a large portion of the vessels conducting the commerce of that river.  That was the case of the construction of a bridge across the Ohio river, a public navigable stream.  Chief Justice TANEY, in delivering the opinion, among other things, said : " Congress undoubtedly have the power to regulate commerce upon it.  They have the right to prohibit obstructions to its navigation ; to declare such obstruction a public nuisance ; to direct the mode of proceeding in the courts of the United States to remove it ; and to punish any one who may erect or maintain it ; or they may declare what degree or description of obstruction shall be a public nuisance ; as, for example, the height of a bridge over the river, or the distance to which a wharf may be extended into its navigable waters.  *But this power has not been exercised.*  There is no law of the United States, declaring an obstruction of the Ohio, *or any other navigable river*, to be a public nuisance.  Nor is there any act of congress regulating the height of bridges.  We can derive no jurisdiction therefore upon this subject, from any law of the United States, and if we exercise it, we must derive our authority from some other source."

After reviewing a variety of cases in that court, and among them that of *Wilson* v. *Black Bird Creek Marsh Co.*, * he says :  " Apart from any decisions on the subject, I cannot perceive how the mere grant of power to the legislative department of the government, ' to regulate commerce,' can give to the judicial branch the power to declare what shall, and what shall not, be regarded as an unlawful obstruction ; how high a bridge must be above the stream, and how far a wharf may be extended into the water, when we have no regulation of congress to guide us.  Nor do I see how we can order a bridge or a *wharf* to be removed, unless it is in violation of some law which we are authorized to administer." †   Again he says : " Whether it is a public nuisance or not, depends upon whether it is or is not injurious to the public."    *    *    " A structure

* *Supra.*                † P. 587.

which promotes the convenience of the public, cannot be a nuisance to it."*    *    *    "I am convinced that the detriment and inconvenience to the *commerce* and travel on the river is small and occasional only, while the advantages which the public derives from the *passage* over, are great and constant. And if the courts of the United States had common-law jurisdiction, and the question was legally before us to determine whether this bridge was a public nuisance or not, I am of opinion that it is not; and that the advantages which the great body of the people of the United States reap from it, outweigh the disadvantages and inconvenience sustained by the commerce and navigation of the river." *    *    * "Bridges have been erected over *many* navigable rivers, and built so near the water that vessels can pass only through a draw. Such bridges are unquestionably *obstructions* and impede navigation." *    * "The courts of the United States have never exercised jurisdiction over any of these *obstructions*, nor declared them to be *nuisances*." It is true that this opinion of the chief justice was a dissenting opinion in the case, but the portion of it extracted is not in conflict with any thing that is decided in the case. The prevailing opinion, delivered by Justice McLEAN, admitted that congress had not by any act declared in terms that a State should not obstruct the Ohio river, but his opinion in that case is based, not upon the ground that States had no power to grant bridge charters, but upon a compact made between the States of Virginia and Kentucky, at the time of their admission into the Union, to the effect that the use and navigation of the River Ohio should be free and common to the citizens of the United States, and he says : " This *compact*, by the sanction of congress, has become a law of the Union. What further legislation [he says] can be desired for judicial action ? " This *compact*, ratified by congress, was congressional action. Justice McLEAN does not question, in his opinion, the case of *Wilson* v. *Black Bird Creek Marsh Co.*, at that time and ever since held by that court, and in our own State court, to be settled law. The opinion of the chief justice, so far as it affects the case at-bar, has since become the settled law in that court, as will be seen as we proceed. Justice DANIEL, in the same case, though differing from the chief justice upon other points, entirely concurs with him on this point, and holds

*P. 591.

that the decision of that court, in *Wilson* v. *Black Bird Creek Marsh Co.*,* is conclusive.    That case, he says, " presented an *absolute obstruction* by a dam of a water-course, navigable by vessels of considerable size, and in which the tide ebbed and flowed." The person who undertook to destroy this dam, so built across navigable water, was the master of a vessel regularly licensed and enrolled according to the navigation laws of the United States.    He was sued by the owner of the dam in trespass.    He justified on the ground that the creek was a navigable stream in the nature of a highway, giving to him the right of free navigation ; that the dam was an illegal obstruction, a nuisance, and that to remove and abate it he did the act complained of.    The plaintiff had judgment upon the law of the case, and this judgment was sustained in the court of the United States.

*Limited* or *partial obstructions*, which but partly impair navigation, do not authorize an injunction, and will not sustain a judgment to abate it, so held in *Palmer* v. *Commissioners of Cuyahoga*.† The court says a *dam* may be thrown over a river, provided a *lock* is so constructed as to permit boats to pass with little or no delay, and without charge.    A temporary delay, such as passing a lock, cannot be considered an *obstruction*.    *    *    Again, " a *draw-bridge* across a navigable water is not an obstruction.    The obstruction would be but momentary, to raise the draw ; and, as such a work may be very important in a general intercourse of the community, no doubt, therefore, is entertained as to the power of the State to make the bridge."

The power as to State action over navigable waters, and of commerce thereon, was again the subject of the fullest consideration by the Court of the United States, in the case of the *City of New York* v. *Miln*.‡    The case of *Gibbons* v. *Ogden*, and all the previous cases affecting the exercise of State power, were reviewed and considered.    The court say : §    " We choose rather to plant ourselves upon what we consider impregnable positions.    They are these : That a *State* has the same undeniable and unlimited jurisdiction over all persons and things within its territorial limits, as any foreign nation, where that jurisdiction is not surrendered or restrained by the Constitution of the United States."

---

* *Supra.*       † 3 McLean, 226.       ‡ 11 Peters.       § P. 138.

Justice THOMPSON says, in the same case : " It is not necessary
to fix any limits upon the legislation of congress and the States,
or to say how far congress may, under the power to regulate
commerce, control State legislation in this respect.   It is enough
to say that whatever the power of congress may be, *it has not
been exercised so as in any manner to conflict with State law,*" *
and he concludes by saying, " that the States may retain the
exercise of powers which, although they may in some measure
partake of the character of commercial regulations, yet they
remain in force until congress asserts the exercise of the power
under the grant of power to regulate commerce."   If these
cases are law, the opinion of the referee upon the law to the con-
trary is erroneous.   He claims to have adopted the cases of the
*People* v. *Vanderbilt* as applicable to the case he decided.   In this
he is mistaken, as we have shown.   They are cases of purpresture.
He also relies upon the case of *The Columbus Ins. Co.* v. *The Peoria
Bridge Association,* † decided at the Circuit Court, a case of an
obstruction of the Illinois river by a bridge, which was determined
to be a *material obstruction* to its navigation.   This bridge was
authorized by the legislature of Illinois.   I have not this case now
before me, to see to what extent the bridge was an obstruction, nor
upon what ground it could have been decided ; but if it is in *direct
conflict* with the cases above cited from the Court of the United
States in bank, I should hold the latter to be controlling authority.

    In more than one point it is certain that it differs from the case
at bar, that of being a bridge, and that of it being found to be a
*material obstruction.*   Another suggestion on the question of con-
flict : the injury complained of in the case in 6 McLean, was two years
prior to the decision in the United States Court in the *Wheeling
Bridge case,* from which we have made the above extracts.   But
if the case upon this point can be settled by judicial authority,
the case of *Gilman* v. *Philadelphia,* which was decided in 1865,
reported in 3 Wallace Reports, 713, etc., must put even the case
in 6 McLean ‡ at rest.   It is in direct conflict with it, as it is
claimed, and the case of *Gilman* v. *Philadelphia* adopts the doc-
trine extracted from the cases above cited of *Pollard* v. *Hagan,
Gibbons* v. *Ogden, Martin* v. *Waddell, The People.* v. *R. & S. R. R.*

*P. 40.                          † 6 McLean, 70.                          ‡ *Supra.*

*Co.*,[*] and especially *Wilson* v. *The Black Bird Creek Co.*, which, the court says, is the most important authority in its application to the question of State jurisdiction, and in the exercise of State control over the navigation of internal waters.

Judge SWAYNE says in this case: " The States have always exercised this power, and from the nature and objects of the two systems of government, they must always continue to exercise it; subject, however, in all cases, to the permanent authority of congress, whenever the power of the States shall be exerted within the sphere of the commercial power which belongs to the nation." The case of *Wilson* v. *Black Bird Creek Marsh Co.* was again approved as sound in *City of New York* v. *Miln.*[†] " The power of congress over the subject does not extend further than the regulation of commerce with foreign nations and among the States. Beyond these limits the States have not surrendered their power over the subject, and may exercise it independently of any control or interference of the general government." [‡]  The laws of the State have been upheld by the court, except in cases where they were in conflict or were adjudged by the court to be in conflict. [§]  The right to what is called free navigation is also claimed under the law of congress, granting licenses for the coasting trade, passed 18th February, 1793. This, it is conceded, is the only general act of congress under the power to regulate commerce, etc. This act, it is true, confers freedom of navigation on national navigable waters, wherever navigation is or can be pursued. The designation of ports of entry and location of light-houses, are mere regulations for the purposes of revenue, etc., of securities to commerce. The act is silent as to any control over landings, wharves, piers or docks, at commercial ports or places upon the margin of navigable streams. It does not attempt to control or circumscribe this character of necessary aids to commerce within State jurisdiction. It does not attempt to define what freedom of navigation means, nor what is its extent; and no American court has yet held that a coasting vessel " has the absolute and exclusive right to go wherever its master wills, when he will, and just as he wills, reckless of the rights of all others."

[*] 15 Wend.                                    [†] 11 Peters, 146.
[‡] Per NELSON, J., in Sinnot v. Davenport, 22 How. R., 243.     [§] Id., 244.

The freedom of navigation granted by these coasting licenses is like every other freedom in a free country — a freedom to be ascertained and regulated by law. When congress shall speak, they will have the right to obey her voice. When congress omits or refuses to speak, then it is duty to obey the voice of the jurisdiction in which the navigation is carried on. In this case congress has failed to speak. I do not propose to consider this point further upon authority. We think that we have already demonstrated that the soil under navigable rivers, within the territory of the State, especially to the extent of low-water mark, is in the State. A discussion of the law beyond this point would be obiter. This case shows that the plaintiff applied to the proper authorities of the State for a conveyance of title to that extent, for the purpose of erecting a wharf, required or designed as a facility to transact an extensive commercial business in certain commodities. The State granted the right and the soil to that end. For that purpose he commenced the construction of such a wharf. This is found by the referee to be an obstruction to the free navigation of the stream by the plaintiff.

It is *not* found to be a *material* obstruction, nor an obstruction amounting to a nuisance; yet, notwithstanding, judgment of perpetual injunction against the construction of such a wharf for such a purpose, by virtue of such authority, is given in the case. This, in my opinion, upon the authorities cited, is clearly erroneous. I think it is my duty to hold in this case that, in the absence of any legislative action by congress affecting this creek or the soil under it, that the defendant's patents from the State of New York, gave him title to the soil upon which he was constructing this wharf, as against all other claimants thereto; that such construction being within low-water mark, as the referee finds, and for commercial purposes, the structure could not, in law, be a nuisance or an illegal obstruction that justified a judgment that it be abated; that as, upon the law of the cases above cited, the advantages to commerce by the construction of a wharf, are first to be encouraged; and if it in any degree interferes with passage or navigation of the stream by one individual, or for transportation of one article of commerce, the slight inconvenience to the transportation of such traffic is no sufficient reason for asking equitable relief by one hav-

ing only the same common right of passage on the waters, against another possessing the same common right.* True, even a rightful structure, one of public utility, may be so unskillfully erected, may so interfere with public rights, as to do injury to others, for which there is a remedy; but no such case is before us to be considered.

I am inclined to hold also that the sixth finding of the referee, called a finding of fact, but which contains a reason or argument that makes it also a finding of law, cannot be sustained by the evidence, and is not sound, even if it would justify, if true, the right to bring the action.

The ground of this finding is " *the character and extent of their business.*" I cannot admit, and am not prepared to hold, that the extent to which a party is conducting business, gives him superior rights — rights which another, with the same common claim of navigation, with right to use it to the same extent, may not exercise or enjoy also, even though he may desire to exercise it to a less extent. The creek in question is a common highway, equally free to all citizens who desire to use it, and it is under control of State authority as we have shown, and is subject to State regulation, at least so far as the soil thereunder is the soil of the State.

The granting of the right to the soil to low-water mark, to build a wharf thereon, is a franchise. It was said by Chancellor WALWORTH, in *Beekman* v. *S. & S. R. R. Co.*,† " The privilege of making a road and taking tolls thereon, is a franchise as much as the establishment of a *ferry* or a public *wharf*, and taking tolls for the use of the same. This language was repeated and adopted in *Davis* v. *The Mayor of New York.*‡ This last case was a case of purpresture, in building a railroad in the streets. In giving the opinion in that case, against the right, DENIO, J., said : " The corporation of New York may, without doubt, make grants of a public ferry or a public wharf, if the power to do so was contained in their charter," etc. Their charter of course was by State authority. * * * " I have already said," says the judge, " that if the authority to establish the railroad had been granted by the

* Wheeling Bridge case, pp. 592, 605.   † 3 Paige, 75.   ‡ 14 N. Y., 523,

legislature, mediately or immediately, the road could not have been a nuisance."

The learned judge then proceeds to show the true legal difference between an *authorized* obstruction and a purpresture or an unauthorized obstruction. He says : "If it was authorized, the inconvenience must be submitted to ; but if placed there without right, the authors of the act could not defend themselves from the charge of nuisance." Again, \* \* \* "The law regards an unauthorized obstruction of a highway as a nuisance *per se ;* " and among the authorities cited to this end are the English case of *King* v. *Russell* and *Hart* v. *Mayor of Albany*, and others relating to purpresture.

5. The grounds taken by the referee, that "the extent and character of business" authorizes the plaintiff to sue in his name, is. directly in the face of the authority of the case of *Davis* v. *The Mayor, etc.* \* That was the case where one citizen, a tax-payer, brought the action to abate the nuisance. Various questions of practice, under the Code arose, not necessary here to be discussed ; but the right of one citizen to bring such an action where no *special* injury to him was shown, as distinguished from *other citizens*, was fully discussed, and was summed up in this language, which covers the case at bar. The chief justice said : " The relief to be granted in this action must proceed upon the ground that the act imputed to the defendants is either a public nuisance, or the usurpation of a franchise detrimental to all the people of the State. It may not affect *every citizen* equally, but in judgment of law, assuming that no special injury is shown, *they* have an equal right to complain. *Now, it cannot be maintained for a moment that an action will lie by an individual citizen for such an offense.* Such a rule would confound all distinctions between public and private rights and remedies, and would introduce inextricable confusion."

This authority has been adopted, where the injury is consequential, since, and is sustained by various cases before its publication.

The case of *Doolittle* v. *Supervisors of Broome Co.* † is to the same effect. In that case it is said : " The general rule certainly

\* *Supra.*                    † 18 N. Y., 155.

is, that for wrongs against the public, whether actually committed or only apprehended, the remedy, whether civil or criminal, is by a prosecution instituted by the *State*, in its political character, or by some officer authorized by law to act in its behalf. * * * Where a crime committed against the public also includes a private injury, the latter may, it is true, be prosecuted at the suit of the party injured. *But where there is no direct indi-vidual injury* no action can be maintained by a citizen on the ground that his interests as a member of the State have been interfered with or disturbed." At page 160, the rule is illustrated by various cases : * " That it would be unreasonable to multiply suits by giving every man a separate right of action for what dam-nifies him in common only with the rest of his fellow-citizens." Yet it is conceded that where an act complained of, or which is apprehended, besides being a public nuisance, is specially injurious to a private person, he may maintain an action, or a bill for injunc-tion, in his own name. Such a question was considered by Lord Chancellor ELDON, in the case of *Crowder* v. *Tinkler.*† The lord chancellor observed " that great caution is required in granting an injunction of that nature, where the effect will be to stop a large concern in a lucrative trade. * * Upon the question of jurisdiction, if the subject was represented as a mere public nuisance, I could not interfere, as the attorney-general is not a party ; and if he was a party, unless it was clearly a public nuisance, the court would not interpose generally by injunction until it had been tried at law. The complaint is therefore to be considered as of not a public nuisance simply, but what being so in its nature, is attended with extreme probability of *irreparable injury* to the property of the plaintiffs, including also danger to their existence ; on such a case clearly established, I do not hesitate to say an injunction would be granted."

The nuisance in that case was a powder mill ; the injunction was refused until the action should be tried at law. This case was adopted as establishing the proper rule in the United States Court, in *The City of Georgetown* v. *Alexandria Canal Co.* ‡ The court says : " A public nuisance being the subject of criminal jurisdiction, the *ordinary* and *regular* proceeding at law is by indictment or

---

* 4 Blackstone Com., 167.          † 19 Ves., 619, 623.          ‡ 12 Peters, 91.

information, by which the nuisance may be abated, and the person who caused it may be punished. If any particular individual shall have sustained *special damage* from its erection, he may maintain a private action for such *special damage*, because to that extent he has suffered *beyond his portion of injury* in common with the community at large." * But says the court: "Beside this remedy at law, it is now settled that a court of equity may take jurisdiction in cases of public nuisance, by information filed by the attorney-general."† *O'Brien* v. *Norwich and Worcester Railroad Company*, ‡ is a case almost identical in all its features, so far as the principle is concerned, with the case at bar. The court hold in that case that a bill in equity for an injunction will not be entertained, unless it is shown that a *particular* injury is done to the plaintiff, *distinct from that which we suffer in common with the rest of the public*. The interrogatory is significantly put by the court: "What *special* damage will the plaintiff sustain? What injury distinct from that done to the public at large?" After referring to the interest set forth in the bill, both as to navigation, to trade and commerce, to the building and launching vessels, for agricultural purposes and to fisheries, and that he is deprived of his lawful right of navigation, the court says: "The same injury might result to *every other citizen* who might have occasion to pass up and down for similar purposes."

The same rule was held in Massachusetts in *Smith* v. *City of Boston*.§ The court says: "The creation of a public nuisance can only be punished and suppressed by a public prosecution; and though a man who lives *near* it and has occasion to pass it daily, *suffers a damage altogether greater* than one who lives at a distance, he can have no *private* action, *because in its nature* it is *common* and *public*." In *Doolittle* v. *Supervisors of Broome*, ‖ the court reviews all the cases which are at all in conflict with the views therein expressed, and upon the authority of that, and the cases cited hereinabove, I think the referee was in error in holding that the plaintiff sustained a special and peculiar injury because of the character and extent of their business. Every other navigator of the Rondout

---

* This is the rule laid down also in Bacon's Abr., Nuisance, B., 51, and in 2 Ld. Raymond, 1163.

    † P. 97.     ‡ 17 Conn., 371.     § 7 Cush., 255.     ‖ *Supra.*

creek had an equal right to extend his business in the same or in any other traffic. What rule is *to* determine the line which measures the case where the *extent* of business is sufficient to authorize a private action? Suppose each navigator conducted business to the same extent, could each then bring his private action against the defendant? Does the law recognize a rule that *large* dealers or navigators can bring actions that smaller ones cannot? Is this free navigation equally free to all? Is it, then, the *character* of the plaintiff's business, as found by the referee, that confers this right? What is that character of business? It is the transportation of coal. What then gives the transporter of *coal* a special claim to damage, to which the transporter of any other kind of freight or commodity is not entitled? How is the transporter of coal affected by *special, peculiar* or *irreparable* injury, that is not common to every other citizen and every other transporter of every other commodity. Every other citizen has an equal right to transport coal to the same extent. Certainly, the learned referee did not intend to hold that because the plaintiff is now exercising the whole trade in coal, this gave a private right of action. If that trade should be quadrupled and the flotilla of boats engaged be doubled, the whole surface of the creek would be not only insufficient for such navigation, but would amount to such a monopoly of possession as to drive off every other attempt of every other transporter from the *common* right and equal enjoyment of the navigation of the stream, and create a nuisance by monopoly. In fact, the whole stream itself would be insufficient for the plaintiff's purposes of transportation alone. These little streams, it will be found, cannot supply the great, the increasing, demands of commerce of the future. Nature has made no provision for their expansion to meet those wants *now*. What then shall be done when it is doubly increased? As the demands of commerce require increased means and facilities to this end, the enterprising spirit of the age has *been* and *is* providing artificial resorts, by canals and railroads to meet that demand. It is little short of an absurdity to suppose that the little Rondout creek will be found equal to these growing public wants of commerce in that direction. But to the extent of its capacity, it is, it must, it will remain a free, common, public highway, equally free and equally common to every commodity

that its narrow surface can accommodate. Nor is it reasonable that because of its limited capacity, any one commercial commodity — whether it be grain, or cement, or lime, or coal — shall be crowded out to give exclusive privileges or place to another; nor is it any reason, in my opinion, that because of its limited capacity, docks and wharves and piers, for commercial advantages, should be excluded, enjoined or forbidden, to aid in whatever of the rights of commerce it may accommodate. If the Rondout creek, with its present limited capacity, is found insufficient to meet all the growing wants of internal commerce passing in that direction, instead of a rivalry between parties entitled to common rights thereon, and litigation in the courts to determine preference of rights, it will be wiser, more in accordance with the spirit of the age, to the growing demands of commerce and to the public necessities, to add to the facilities of transportation by the artificial aids of canals and railroads. What nature has failed to supply in this regard by great rivers, art and enterprise, and in fact self-interest, will imperatively demand to have done by artificial aids. The same commendable spirit of enterprise that projected a canal from Honesdale to Eddyville, if carried on by the same spirit two miles farther by canal or railroad, would make the interposition of the courts to regulate rights unnecessary. The day has passed away when the whole commerce of this country can be conducted by the natural water channels. Many of these, especially those as limited in capacity as the little Rondout creek, are found insufficient to supply all its growing demands. The day has more than dawned when commerce is to convert and call into exercise the facilities of transit afforded by land as well as water channel. The same beneficent providence which established the seas and deepened the channels of great rivers, has endowed man with wonderful powers of invention, and with a spirit of enterprise which has allowed him to overcome the obstacles of nature, and to force artificial channels of commerce through mountains and across rivers. Individual, or corporate, or State enterprise only, can supply the necessary facilities of commerce, which the capacity of this little creek cannot supply. The courts cannot enlarge the capacity of the Rondout by decree.

They cannot exclude one commodity to favor another; they can-

not enjoin small commercial enterprises to give place to larger ones. Nor can they exclude any citizen from exercising the common rights of navigation thereon. The courts, when their interposition is sought to determine these conflicting rights, must, in the just and faithful exercise of judicial duty, declare that every branch and commodity of commerce, whether extended or limited in degree, and every aid and facility intended for its advancement, are entitled to equal protection and an equal status in the rights of enjoyment of free navigation, and in furnishing the facilities and aids thereto. Placing the rights of the parties in the case before us upon this broad platform of equality of rights before the law, the judgment in this case should be reversed with costs, the injunction dissolved and a new trial granted, the costs thereof to abide the result. Reference discharged.

MILLER, P. J., and PARKER, J., concurred.

Judgment reversed, with costs; injunction dissolved, and a new trial granted; the costs thereof to abide the result. Reference discharged.